IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RODNEY TOW, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-11-3700 |
| | § | |
| AMEGY BANK N.A., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

  This Memorandum and Opinion addresses motions for summary judgment on claims the bankruptcy trustee, Rodney Tow, asserted against defendants John Speer and Michael Manners and companies they owned or controlled. Manners founded Royce Homes, L.P., and was a 50% owner of the company between 1998 and 2006. Speer, through companies he controlled, owned the other 50% until 2006, when he bought out Manners's interest for over $30 million. Speer funded the purchase through a $20 million personal loan from Amegy Bank (the "Amegy Loan") and a $13 million promissory note to Manners (the "Manners Note"). Royce Homes distributed money to Speer that Speer used for the payments on the Amegy Loan and the Manners Note. After Speer bought out Manners's interest and Manners became Chairman Emeritus, Royce Homes paid him a salary and sponsored his racing team, MGM Motorsports.

  Speer discontinued Royce Homes's operations in August 2008. In April 2009, four of Royce Homes's creditors initiated Chapter 7 involuntary bankruptcy proceedings against the company. In October 2011, Tow sued Speer, Manners, Amegy Bank and Amegy Mortgage Company (together, "Amegy"), and other defendants. Tow alleged that the distributions from Royce Homes to Speer

and payments from Royce Homes to Manners and MGM Motorsports were fraudulent transfers under the Texas and Delaware Uniform Fraudulent Transfer Acts ("TUFTA" and "DUFTA") and the federal fraudulent transfer statute, 11 U.S.C. § 548.  Tow asserted claims against Speer and Manners for breaching fiduciary duties owed to Royce Homes.  This court previously granted summary judgment dismissing the fiduciary-duty claims against Manners. (Docket Entry No. 215).

The pending motions, and the court's rulings on them, are as follows:

- Speer and Manners moved for summary judgment that the payments Speer made to Manners on the Manners Note and the salary and sponsorship payments Royce Homes made to Manners and MGM Motorsports were not fraudulent transfers.  (Docket Entry Nos. 239, 245).  This motion is granted in part and denied in part.

- Speer moved for summary judgment that a $1.4 million payment on a house that he purchased from Royce Homes was not a constructive fraudulent transfer.  (Docket Entry No. 245 at 12).  This motion is granted.

- Speer moved for summary judgment dismissing Tow's breach-of-fiduciary-duty claims.  (*Id.* at 4–7).  This motion is granted.

- Amegy moved for summary judgment dismissing Tow's remaining claims concerning the purchase of a subdivision referred to as Westwood Gardens by Vestalia LLC, a company Speer formed.  (Docket Entry No. 232).  Amegy also moved for summary judgment on Tow's fiduciary duty, unjust enrichment, theft, and conversion claims that are unrelated to Vestalia.  (Docket Entry No. 233).  Tow moved for summary judgment that Speer was acting as Amegy's agent when he took distributions from Royce Homes to make payments on the Amegy Loan and the Manners Note.  (Docket Entry No. 236).  These motions are denied as moot in light of the settlement between Amegy and Tow, (Docket Entry No. 279), and the subsequent dismissal of those claims, (Docket Entry No. 282).

The reasons for these rulings are explained in detail below.

## I.      Background

The relevant background is set out in detail in the earlier opinions and only briefly summarized here.  Royce Homes was a Delaware limited partnership that built and sold single-family homes in the Houston area until August 2008.  Manners founded Royce Homes and

was the company's chief executive officer until July 1998, when he sold 50% of Royce Homes's equity to Speer and became a limited partner.

In 1998, the parties entered into an Amended and Restated Agreement of Limited Partnership (the "1998 Agreement"). The 1998 Agreement made Hammersmith Group LLC Royce Homes's general partner. Hammersmith had a 1% interest in the partnership. Speer was Hammersmith's president. (Third-Amended Complaint ("TAC") Docket Entry No. 77 at ¶ 61). Speer, as chief executive officer of First Duval Group, Inc., was Royce Homes's limited partner with a 49% interest. Manners, through Royce Homes, Inc., retained a 50 % limited partnership interest. Speer, the president, sole director, and sole owner of Hammersmith, exercised Hammersmith's authority as general partner. (TAC at ¶ 31).

In spring 2006, Manners and Speer entered into negotiations for Speer to buy Manners's remaining interest in Royce Homes. Buying out Manners's 50 % interest cost Speer "$33,342,405 plus a loan fee of $236,386." (TAC at ¶ 41 n.1). Speer entered into two personal obligations to finance this purchase: the $20 million Amegy Loan and the $13,342,405 Manners Note. (TAC at ¶ 40). Speer sought consent to the buyout from Royce Homes's lenders. (Docket Entry No. 115, App. 11, Ex. I). An employee of Royce Homes represented to lenders that Speer would use distributions from Royce Homes's yearly net income to make the payments on the Amegy Loan and Manners Note. (Docket Entry No. 268, Ex. 9). The employee further represented that the distributions would not cause Royce Homes's equity to fall below $40 million and that the company would "remain very comfortably within the bank's [lending] requirements." (*Id.*). The lenders consented. (Docket Entry No. 115, App. 11, Ex. I).

A. **The Amegy Loan**

Speer owed the first principal payment of $10 million on the Amegy Loan on December 31, 2006. (Docket Entry No. 268, Ex. 4 at ¶ 8). On January 3, 2007, Royce Homes wired $10 million to Speer's personal Amegy bank account. (*Id.*, Ex. 4 at ¶ 9). This money came from "draws on the Royce Homes lines of credit." (TAC at ¶ 127 (detailing which lines of credit were used)). Royce Home's chief financial officer testified that this distribution caused Royce Homes to violate its loan covenants. (Docket Entry No. 268, Ex. 5 at 253–54).

On June 30, 2007, Speer owed another principal payment of $2.58 million. (Docket Entry No. 268, Ex. 4 at ¶ 10). Speer made this payment but Royce Homes allegedly "had to draw down on the construction loan credit facilities in order to facilitate this distribution to Speer." (*Id.*). Royce Homes transferred the money to Speer, who made the payment on July 2, 2007 with a check backdated to June 29, 2007. (*Id.*).

The third principal payment of $2.55 million was due on September 30, 2007. (*Id.*, Ex. 4 at ¶ 11). At Speer's request, Amegy extended the due date to December 31, 2007. (*Id.*). On January 4, 2008, Royce Homes paid Speer a $2.55 million distribution. (*Id.*). That same day Speer wrote Amegy a $2.5 million check, dating it December 31, 2007. (*Id.*). Between October 2006 and July 2008, Royce Homes also paid Speer another $1.38 million, which Speer used for interest payments on the Amegy Loan. (*Id.*, Ex. 4 at ¶ 12).

B. **The Manners's Note**

Tow alleged that Speer and Manners devised a plan to pay the Manners Note through distributions from Royce Homes. Royce Homes provided the money used for the Manners Note payments. The payments were billed to Royce Homes as "management fees" for home construction

4

and home closings.  (*Id.*, Ex. 4 at ¶ 14).  Manners testified that he did not provide services for these fees.  (*Id.*, Ex. 6 at 92).  Tow alleged that characterizing the disbursements as management fees allowed Royce Homes to capitalize the payments on the Manners Note as part of the lot values, enhancing those values and allowing Royce Homes to overstate its revenues.  (TAC at ¶ 389).  By June 2007, Speer had paid Manners $3,085,100 on the Note using money from Royce Homes. (TAC at ¶ 178).

### C.    Other Payments to Manners

Royce Homes paid Manners over $200,000 after he sold his interest to Speer.  These payments included a $160,000 annual salary, health insurance, and other benefits.  (Docket Entry No. 268 at ¶ 16).  Tow contends that Royce Homes derived no benefit from these payments.  (*Id.* at 19).  Speer and Manners contend these payments were for Manners's noncompete agreement with Royce Homes and for his role as Chairman Emeritus of Royce Homes, both of which benefitted Royce Homes.

Royce Homes also made payments to Manners's company, MGM Motorsports, which Speer and Manners claim were advertising fees.  Tow claims that these payments were actually for the Manners Note, and that Royce Homes characterized them as marketing fees to make its financial situation look stronger than it was.

### D.    Procedural History

Tow initiated adversary proceedings in October 2011 against Speer and Manners and companies affiliated with them.  Other defendants included Speer's now-deceased ex-wife, Donnie Lou Speer, Vestalia, and Amegy.  The court granted summary judgment dismissing Tow's claims against Amergy and Vestalia arising out of the sale of the Westwood Gardens property.  (Docket

5

Entry No. 214).  The court also granted Manners summary judgment on Tow's claims against Manners and his affiliated companies, except for claims alleging fraudulent transfer.  (Docket Entry No. 215).

The defendants moved to exclude the expert opinions of Saul Solomon, a certified public accountant, and J.F. "Chip" Morrow, an executive consultant who has previously served as a director, president, and chief executive in the finance industry.  (Docket Entry Nos. 207 (Morrow), 220 (Solomon)).  The court denied these motions to exclude.  (Docket Entry Nos. 266, 267).  While the motions were pending, Amegy and Speer and Manners and their affiliated companies moved for summary judgment.  Tow moved for partial summary judgment, seeking a ruling that Speer acted as Amegy's agent when he used distributions from Royce Homes for the Amegy Loan.  (Docket Entry No. 236).  Amegy and Tow have settled the claims between them and these claims have been dismissed with prejudice.  (Docket Entry No. 283).

Speer moved for summary judgment dismissing Tow's claims that the payments to Manners were fraudulent transfers under TUFTA, DUFTA, and the federal fraudulent transfer statute, and that he breached fiduciary duties owed to Royce Homes.[1]  (Docket Entry No. 245).  Manners and his affiliated companies moved for summary judgment on the fraudulent transfer claims against them.  (Docket Entry No. 239).  This Memorandum and Opinion addresses the summary-judgment motions filed by Speer and Manners.

## II.      The Legal Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

---

[1]  Speer also moved for summary judgment against Tow's claims for civil theft, conversion, and unjust enrichment.  (Docket Entry No. 245 at 8).  Tow is no longer pursuing those causes of action.  (Docket Entry No. 270 at 31).

dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." FED. R. CIV. PROC. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . ."  FED. R. CIV. PROC. 56(c)(1)(A).  "[T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact."  *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Celotex*, 477 U.S. at 323).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court —that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine dispute of material fact, it does not need to negate the elements of the nonmovant's case.  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).

"A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."  *Duffie*, 600 F.3d at 371 (internal quotation marks omitted).

"When the moving party has met its Rule 56[] burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."  *Id.*  The

nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Id.* (internal quotation marks omitted). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). "In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party." *Duffie*, 600 F.3d at 371.

## III.    Tow's Fraudulent Transfer Claims

### A.    The Legal Standards

Tow seeks to avoid the payments Speer made to Manners under the Texas, Delaware, and federal fraudulent transfer statutes, TUFTA, TEX. BUS. & COM. CODE §§ 24.001–.013, DUFTA, DEL. CODE TIT. 6 §§ 1301–12, and 11 U.S.C. § 548.  (*See* TAC at 445–57).  The parties agree that the three statutes are not materially different.  Because the parties analyze the fraudulent transfer claims under Texas law, the court does the same.

TUFTA allows a bankruptcy trustee to avoid a debtor's transfers that defraud the estate's creditors.  TEX. BUS. & COM. CODE § 24.008(a)(1); *see also Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 437 (5th Cir. 2013).  TUFTA's purpose is "to prevent debtors from defrauding creditors by placing assets beyond their reach."  *Challenger Gaming Solutions, Inc. v. Earp*, 402 S.W.3d 290, 293 (Tex. App. —Dallas 2013, no pet.); *Citizens Nat. Bank of Tex. v. NXS Const., Inc.,* 387 S.W.3d 74, 79 (Tex. App. —Houston [14th Dist.] 2012) (citing *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App. —Houston [14th Dist.] 2010, no pet.)).  "In general, a determination of liability under TUFTA is a two step process: first, a finding that a debtor made an actual fraudulent transfer or a

constructive fraudulent transfer; and, second, recovery for that fraudulent transfer, or its value, from the transferees." *Spring Street Partners IV*, 730 F.3d at 436 (internal citations omitted).

Fraudulent transfers may be actually or constructively fraudulent. A transfer is actually fraudulent "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1); *see also Spring Street Partners IV*, 730 F.3d at 436–37. "Because proof of 'actual intent to hinder, delay, or defraud' creditors may rarely be accomplished by direct proof, courts may infer fraudulent conduct from the circumstantial evidence and the surrounding circumstances of the transactions." *Kaye v. Lone Star Fund V (U.S.), LP*, 453 B.R. 645, 671 (N.D. Tex. 2011) (citing *Dionne v. Keating (In re XYZ Options)*, 154 F.3d 1262, 1271 (11th Cir. 1998)). TUFTA "supplies a 'non-exclusive list of eleven factors, commonly known as badges of fraud, that courts may consider in determining whether a debtor actually intended to defraud creditors.'" *Spring Street Partners IV*, 730 F.3d at 437(quoting *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008)); *see also* Tex. Bus. & Com. Code § 24.005(b) (listing the eleven factors).

A transfer is constructively fraudulent if the debtor made the transfer:

> [W]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.005(b). Alternatively, a transfer is constructively fraudulent if:

9

> [T]he debtor made the transfer or incurred the obligation without
> receiving a reasonably equivalent value in exchange for the transfer
> or obligation and the debtor was insolvent at that time or the debtor
> became insolvent as a result of the transfer or obligation or if the
> transfer was made to an insider for an antecedent debt, the debtor was
> insolvent at that time, and the insider had reasonable cause to believe
> that the debtor was insolvent . . . .

TEX. BUS. & COM. CODE § 24.006.

### B.    Analysis

#### 1.    The Payments on the Manners Note

##### a.    Tow's Claims that the Payments were Actually Fraudulent

Speer and Manners argue that Tow has presented no summary-judgment evidence that the payments to Speer used for the Manners Note were made with the actual intent to hinder, delay, or defraud Royce Homes's creditors.  Tow argues that the payments were actually fraudulent "because they were fraudulently recorded in the Royce Homes ledgers to conceal [that] they were distributions and to artificially inflate the value of the assets on Royce Home's books."  (Docket Entry No. 268 at 17–18).

Speer's obligations on the Manners Note were determined by the number of lots Royce Homes bought and sold.  Speer was to pay Manners $1,500 for each lot Royce Homes acquired and $1,500 for each sale Royce Homes closed.  (*See e.g.*, Docket Entry No. 268, Ex. 10 at 2; *see also id.*, Ex. 4 at ¶ 14).  Speer represented to lenders that based on current projections, it would take about three years to pay off the Manners Note.  (*Id.*, Ex. 10 at 2).  Between October 2006 and May 2007, Speer paid $2.74 million on the Manners Note.  Disbursements from Royce Homes's bank accounts funded these payments.  (Docket Entry No. 221, App. 1, Ex. A at 21).  Solomon opined that Royce Homes categorized these payments to Manners as "management fees" even though Manners

10

provided no management or other services.  (*Id.*, App. 1, Ex. A at 21–22).  Solomon further opined that Royce Homes included the "fees" in the purchase price of each lot it sold.  (*Id.*, App. 1, Ex. A at 21).  By including the "fees" in the purchase price of each lot, Royce Homes recorded the fees as a receivable, increasing rather than decreasing the company's equity.  (*Id.*).  Tow argues that this falsely exaggerated the value of Royce Homes's assets to lenders and evidences an actual fraudulent transfer under TUFTA.

The allegations and evidence that Royce Homes recorded the distributions for payments on the Manners Note as receivables creates factual disputes as to whether Speer and Royce Homes intended to conceal the true state of the company's finances and hinder, delay, or defraud its creditors.  These disputes preclude the summary judgment Speer and Manners seek.

Speer and Manners did not respond to Tow's argument that recording payments on the Manners Note as Royce Homes receivables rather than as equity distribution demonstrates an intent to hinder, delay, or defraud Royce Homes's creditors.  Instead, Speer and Manners argue that there could not be an actual intent to hinder, delay, or defraud because Royce Homes was Speer's primary income source and he had no incentive to endanger the company's solvency.  (Docket Entry Nos. 239 at 6–7, 245 at 11–12).  This argument fails to recognize that Speer could hope and intend that Royce Homes would succeed and still expose it to unreasonable financial risk, particularly when that risk would initially be borne by the lenders.  The argument also fails to recognize that Speer had an incentive to use Royce Homes's money and credit, rather than his own, to buy Manners out and become the sole owner of Royce Homes.  The present record does not permit a finding that, as a matter of law, the payments on the Manners Note were not fraudulent transfers.

### b.    Tow's Claims that the Payments were Constructively Fraudulent

Speer and Manners do not dispute that Royce Homes received less than reasonable equivalent value for the distributions.  Speer and Manners argue that Tow has not pointed to summary-judgment evidence that Royce Homes was undercapitalized or unable to pay its debts when the distributions were made.  Tow, however, has pointed to summary-judgment evidence raising factual disputes as to whether Royce Homes lacked adequate capital when it made the distributions Speer used to pay the Manners Note.

Tow relies on Solomon's expert report as evidence that Royce Homes had an unreasonably small amount of capital and an inability to pay its debts when it distributed the money to Speer for the Manners Note payments.  Solomon concluded after analyzing the financial data that Royce Homes had unreasonably small capital because it did not have enough equity to meet the loan covenants.  One example is Royce Homes's January 2007 distribution, which Speer used for the first payment on the Amegy Loan.  This distribution caused Royce Homes to breach its loan covenants. (Docket Entry No. 221, App. A, Ex. A at 2, 14, 18).  According to Solomon, "[p]rior to making the $10 million distribution, Royce Homes's management knew or should have known that making the payment would cause Royce Homes to breach its loan covenants."  (Docket Entry No. 268, Ex. 4 at ¶ 26).  Testimony from William Gathmann, Royce Homes's Chief Financial Officer, admitting that the company had breached its loan covenants supports Solomon's conclusion.  (*Id.*, Ex. 5 at 253–54).  Solomon's expert report and summary-judgment evidence create factual disputes material to determining whether, when the distributions were made, Royce Homes had an unreasonably small amount of capital to pay its debts as they came due.  Summary judgment dismissing Tow's claims that the payments on the Manners Note were constructive fraudulent transfers is denied.

### 2.      The Royce Homes Payments to Manners

### a.    Tow's Claims that the Payments were Actually Fraudulent

Manners has moved for summary judgment dismissing Tow's claim that $295,000 Manners received from Royce Homes after selling his 50% interest to Speer was a fraudulent transfer.  After Manners sold his interest, he served as Chairman Emeritus for Royce Homes.  He received an annual salary of $160,000 plus health insurance and other benefits.  Manners argues that Tow has not pointed to summary-judgment evidence that these payments were actually or constructively fraudulent.  Tow's response to Manners's summary-judgment motion does not address Manners's argument, or point to evidence raising a factual dispute, that the payments from Royce Homes to Manners were actual fraudulent transfers.  (*See* Docket Entry No. 268 at 19–20).  Manners is entitled to summary judgment dismissing Tow's claim that the payments from Royce Homes were actual fraudulent transfers.

### b.    Tow's Claims that the Payments were Constructively Fraudulent

Tow contends that the payments to Manners were constructively fraudulent transfers on the ground that Manners did not provide Royce Homes value for these payments.  (Docket Entry No. 268 at 19) ("There is nothing to suggest that the money paid on the Manners Note provided any value to Royce Homes.").  This position is inconsistent with the position Tow took earlier in the litigation, when he asserted breach-of-fiduciary-duty claims against Manners.  In Tow's response to Manners's motion to dismiss the breach-of-fiduciary-duty claims against him, Tow emphasized "a wealth of facts" showing that Manners remained involved in Royce Homes's operations after he sold his interest to Speer.  Tow noted that Manners participated in annual planning meetings and other aspects of the company's management.  (Docket Entry No. 126 at 39).  Solomon's report, which Tow relies on for the proposition that Manners provided no value to Royce Homes after he

13

sold his 50% interest to Speer, does not appear to consider the "wealth of facts" that Tow cited and relied on.  Nor does Solomon appear to have considered whether Manners's name continued to provide value for the company.  Courts have recognized that companies often use the title and status of "chairman emeritus" to maintain the goodwill associated with a well-known founder.  *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 394 (2d Cir. 2009).[2]

Tow has inconsistently described Manners's continued involvement with Royce Homes. Tow nevertheless has pointed to evidence that Royce Homes paid Manners money from which it derived no benefit.  Solomon opined that the noncompete agreement that Manners signed with Royce Homes provided no benefit to Royce Homes.  (Docket Entry No. 221, App. 2, Ex. B at 16 (opining that any value Royce Homes received from Manners "delaying a hypothetical homebuilding business" was "just pure speculation")).  Tow has presented sufficient summary-judgment evidence to create factual disputes material to determining whether Royce Homes's payments to Manners were constructive fraudulent transfers under TUFTA.  These factual disputes preclude summary judgment dismissing Tow's claims that Royce Homes's payments to Manners were constructive fraudulent transfers.  Manners's summary-judgment motion is denied as to the constructive fraudulent transfer claim.

### 3.    Payments to MGM Motorsports

Tow seeks avoidance of $175,000 that Royce Homes paid to sponsor Manners's racing team, MGM Motorsports.  Tow alleged that the sponsorship fees were actually and constructively fraudulent.  (TAC at ¶¶ 557–58).  Manners moved for summary judgment on this claim, but his motion argues only that the sponsorship fees were not constructively fraudulent.  Manners argues

---

[2] Mark Schwartz, expert for the defendants, opined that the noncompete Manners signed as part of the purchase agreement was worth $1.5 million to Royce Homes.  (Docket Entry No. 199, Ex. 1 at 35).

that "Tow has no evidence that Royce did not receive equivalent value for the advertising provided." (Docket Entry No. 239 at 10).  Whether a debtor received equivalent value for a transfer is material to allegedly constructive fraudulent transfers, not actual fraudulent transfers.  *Compare* Tex. Bus. & Com. Code § 24.005(a), *with* Tex. Bus. & Com. Code §§ 24.005(b), 24.006.

Tow's response does not address Manners's argument that there is no summary-judgment evidence supporting an inference that the sponsorship fees were constructively fraudulent.  Instead, Tow addresses whether Royce Homes used the sponsorship fees to intentionally delay, hinder, or defraud the creditors, an issue that Manners did not raise as a basis for summary judgment.

Tow has not pointed to summary-judgment evidence showing that Royce Homes did not receive reasonably equivalent value for its sponsorship of MGM Motorsports.  Such sponsorships can be valuable.  *See, e.g.*, *VICI Racing, LLC v. T-Mobile USA, Inc.*, 921 F. Supp. 2d 317, 320 (D. Del. 2013); *Menard, Inc. v. C.I.R.*, 2004 WL 2066599, at *7, T.C.M. (RIA) 2004-207( Sept. 16, 2004) (recognizing that companies paid millions of dollars to sponsor NASCAR auto racing team). Manners is entitled to summary judgment dismissing Tow's claim that Royce Homes's sponsorship of MGM Motorsports was a constructive fraudulent transfer.  Tow's claim that the payments to MGM Motorsports were actual fraudulent transfers survives.

### 4.    Speer's House Payment to Royce Homes

Tow alleged that a $1.4 million payment Speer made on a $5 million house he purchased from Royce Homes was a fraudulent transfer.  (*See* TAC at ¶¶ 633–43).  Speer appears to have moved for summary judgment only on the claim that the house purchase was a constructively fraudulent transfer.  (*See* Docket Entry No. 245 at 12).  Speer's argument is that Tow has not shown that the purchase price was for less than market value.  Such a showing is an essential element of

a constructively fraudulent transfer claim, not of an actually fraudulent transfer claim.  *Compare* TEX. BUS. & COM. CODE § 24.005(a), *with* TEX. BUS. & COM. CODE §§ 24.005(b), 24.006.  Tow's response to the motion does not address Speer's argument that the payment was not a constructive fraudulent transfer.  Tow's response argues that the transfer was actually fraudulent.  (Docket Entry No. 270 at 31).  Tow has not pointed to summary-judgment evidence showing that Royce Homes failed to receive reasonable equivalent value for the house.  Speer is entitled to summary judgment on the claim that the $1.4 million payment was constructively fraudulent.  Tow's claim that the payment was an actual fraudulent transfer survives.

## IV.    Tow's Claims for Breach of Fiduciary Duty

Tow alleged that Speer owed Royce Homes fiduciary duties that he breached when he used distributions from the company to fund his purchase of Manners's 50% interest.  Tow asserted related claims against Speer for aiding and abetting and conspiring with Manners, Amegy, and other defendants to breach those duties.  (*See, e.g.*, TAC at ¶ 370).  Speer has moved for summary judgment as to these claims, arguing that as Royce Homes's sole owner and partner, he cannot be liable for breaching a fiduciary duty owed to himself.  (Docket Entry No. 245 at 4–6).

In addressing a similar challenge to Tow's allegations that Manners conspired with Speer to breach fiduciary duties that Speer owed to Royce Homes, this court noted that "after the 2006 buyout, Speer was, in effect, Royce Homes's only owner" and that "Delaware law is clear that a company's sole owner cannot breach fiduciary duties owed to the companies he wholly owned." (Docket Entry No. 215 at 24 (internal quotations omitted)).  The court noted that Tow has not "cited legal support for the proposition that a nonowner can be liable for conspiring with the sole owner of a partnership for breaching duties that the owner owes himself." (*Id.*).  Tow has not cited a case

finding that the sole partner of a limited partnership can be liable for breaching a fiduciary duty to the partnership.

Tow contends that a limited partnership may assert a breach-of-fiduciary duty claim and other claims on its own behalf against its general partner.  (Docket Entry No. 270 at 13).  Tow reasons that if Royce Homes could assert a breach-of-fiduciary duty claim against Speer, then Tow may assert the claim in his capacity as trustee of the bankruptcy estate.  But Delaware does not allow a limited partnership to assert claims on its own behalf.  Tow cites *Thompson Door Co. v. Haven Fund*, 351 A.2d 864 (Del. 1976) and cases applying Title 10, § 3904,[3] of the Delaware Code for the proposition that a limited partnership has the right to sue on its own behalf.  Courts refer to Title 10, § 3904 as the "common name" statute.  *In re Olympic Mills Corp.*, 333 B.R. 540, 553 (B.A.P. 1st Cir. 2005), *aff'd*, 477 F.3d 1 (1st Cir. 2007).  The "common name" statute "allows partnerships to sue and be sued in the partnership name."  (*Id.* (citing DEL. CODE TIT. 10, § 3904)).  The purpose of the "common name" statute is "to permit a plaintiff to file suit against an unincorporated association of persons using a common name without having to identify all the members of that group individually."  *Citizens Bank v. Design-A-Drape, Inc.*, No. 07C-03-385, 2008 WL 3413329, at *3 (Del. Super. Ct. July 30, 2008), *aff'd sub nom. Citizens Bank v. Bockrath*, 966 A.2d 347 (Del. 2009) (citing *Silliman v. F.I. DuPont*, 302 A.2d 327, 331 (Del. Super. Ct. 1972)).  The statute does

---

[3] Delaware Code Title 10, § 3904 states:

> An unincorporated association of persons, including a partnership, using a common name may sue and be sued in such common name and a judgment recovered therein shall be a lien like other judgments, and may be executed upon by levy, seizure and sale of the personal and real estate of such association, and also that of the persons composing such association in the same manner with respect to them as if they had been made parties defendant by their individual names. Satisfaction thereof may also be obtained by attachment process.

not allow a limited  partnership to assert on its own behalf a claim against a general partner.  The statute does not provide a basis for Tow's assertion of the fiduciary duty claims against Speer.[4]

Tow's citation to cases holding that "Delaware law expressly rejects the notion that directors of a corporation owe no fiduciary duties to a limited partnership or LLC controlled by that corporation" is unpersuasive.  (Docket Entry No. 270 at 10–12 (quoting *In re TOUSA, Inc.*, 437 B.R. 447, 460 (Bankr. S.D. Fla. 2010); *see also In re USACafes, L.P. Litig.*, 600 A.2d 43, 49 (Del. Ch. 1991)).  These cases do not hold that a partnership may assert claims on its own behalf.  Instead, they stand for the established proposition that a parent corporation may owe a fiduciary duty to a subsidiary corporation that it controls, and may be liable for breach for engaging in a self-dealing transaction.  For example, if a "corporate general partner formed a new entity and then caused the general partner to sell partnership assets to the new entity at an unfairly small price, injuring the partnership and its limited partners," the general partner's conduct would have injured the partnership and limited partners, creating a breach-of-fiduciary duty claim for the injured partners.  *In re USACafes*, 600 A.2d at 49.  Tow's breach-of-fiduciary-duty claims against Speer are distinguishable from the claims in *In re USACafes* and *In re TOUSA*.  Tow does not claim that Speer intentionally injured Royce Homes to benefit another corporate entity that Speer owned or controlled.

Summary judgment dismissing Tow's breach-of-fiduciary-duty claims against Speer is granted.  The related claims for aiding and abetting and for conspiring to breach fiduciary duties is granted as well; these claims are predicated on Speer for breaching fiduciary duties owed to Royce Homes.

---

[4] Tow's reliance on the partnership agreement as a basis for asserting fiduciary duty claims against Speer fails for similar reasons.

V.      **Conclusion**

This court grants in part and denies in part Speer's and Manners's motions for summary

judgment.  The court grants summary judgment and dismisses the following claims:

•       that Speer owed and breached a fiduciary duty to Royce Homes;

•       that the payments from Royce Homes to Manners were actual fraudulent transfers;

•       that the payments from Royce Homes to MGM Motorsports were constructive fraudulent
        transfers; and

•       that Speer's house payment to Royce Homes was a constructive fraudulent transfer.

The following claims survive summary judgment:

•       the claim that the payments on the Manners Note were actual and constructive fraudulent
        transfers;

•       the claim that the payments Royce Homes made to Manners were constructive fraudulent
        transfers;

•       the claim that the sponsorship fees Royce Homes paid MGM Motorsports were actual
        fraudulent transfers; and

•       the claim that the payment on Speer's house was an actual fraudulent transfer.

SIGNED on January 31, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

19